AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

UNITED STATES OF AMERICA

v.

JASON CHRISTOPHER DONNER,

Defendant.

Case No.   2:23-mj-00361-DUTY

LODGED
CLERK, U.S. DISTRICT COURT
1/26/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
1/30/23
CENTRAL DISTRICT OF CALIFORNIA
BY: EQ  DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 30, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1704 | Unlawful Possession of Postal Keys |

This criminal complaint is based on these facts:

Please see attached affidavit.

☒ Continued on the attached sheet.

/s/ Marlayna Waters
Complainant's signature

Marlayna Waters, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 30, 2023

Judge's signature

City and state: Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
Printed name and title

AUSA: David C. Lachman (x5564)

## **AFFIDAVIT**

I, Marlayna Waters, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and arrest warrant against JASON CHRISTOPHER DONNER ("DONNER") for a violation of 18 U.S.C. § 1704 (Unlawful Possession of Postal Keys).

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Los Angeles Police Department ("LAPD") in Canoga Park, California, as described more fully in Attachment A:

   a. a Black Apple iPhone, serial number unknown ("SUBJECT DEVICE 1");

   b. a black cell phone, serial number unknown ("SUBJECT DEVICE 2");

   c. a black Apple iPhone, serial number unknown, with black rubber case ("SUBJECT DEVICE 3);

   d. a grey Lenovo laptop, serial number MP261L38 ("SUBJECT DEVICE 4");

   e. a Black Asus laptop, serial number N4N0CX02E687142 ("SUBJECT DEVICE 5");

   f. a blue Apple iPhone, serial number unknown, with a clear rubber case ("SUBJECT DEVICE 6"); and

   g. a black damaged Samsung Galaxy cell phone, serial number unknown ("SUBJECT DEVICE 7"); and

   h. an Apple iPhone, model number A1660, serial number unknown, with a black case ("SUBJECT DEVICE 8").

  3. The requested warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1704 (Unlawful Possession of Postal Keys), 1708 (Mail Theft and Possession of Stolen Mail), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 922(g)(1) (Felon in Possession of Firearm and Ammunition), 924(c) (Possession of Firearm and Ammunition in Furtherance of Drug Trafficking Crime), and 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

  4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

  5. I am a U.S. Postal Inspector with the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in

Los Angeles, California.  I have been so employed since April 2021.  I am currently assigned to the Pasadena Mail Theft/Violent Crimes team, where my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of the United States mail; possession of stolen mail; and crimes related to the use, theft, or counterfeiting of postal keys (referred to as "arrow keys") and locks.  As part of the Mail Theft team, I also investigate crimes in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of others' information for financial gain, as these criminal schemes have been known to be perpetrated through the U.S. Mail.

6.   Previously, I was a Special Agent with the United States Secret Service, where I was employed from January 2016 through April 2021.  I was assigned to the Los Angeles Counterfeit Squad and Protective Intelligence Unit, where my areas of focus were financial, fraud, and threat-based intelligence cases.

### III. SUMMARY OF PROBABLE CAUSE

7.   On December 30, 2022, a concerned citizen called the Los Angeles Police Department ("LAPD") to report a male, possibly under the influence of an unknown substance, asleep behind the wheel of a silver Dodge Charger ("Charger"), with license plate number "8PEV399," in Canoga Park, California. LAPD identified DONNER as the driver of the Charger, and after a

brief pursuit, located DONNER in a nearby alley with a key fob to the Charger in DONNER's right front pocket.

8.  When they searched the Charger, LAPD officers located a keyring with three counterfeit postal keys inside a gray backpack on the floorboard in front of the front passenger seat. LAPD officers also found mail matter addressed to DONNER; mail matter, credit/debit cards, IDs, and miscellaneous documents containing personal identifying information for individuals other than DONNER; approximately 15 rounds of ammunition and a firearms magazine; and substances resembling heroin and methamphetamine and drug paraphernalia in the Charger.  SUBJECT DEVICES 1-7 were recovered from the Charger at the time of DONNER's arrest.

9.  In the area near where DONNER had been hiding, LAPD found additional identity documents and a black Smith & Wesson, Model M&P 40 Shield, .40 caliber semi-automatic pistol, bearing serial number JEZ0751, loaded with 4 rounds of ammunition and a round in the chamber, in a trash can on top of a white trash bag.

### IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of this investigation, I am aware of the following:

**A.   LAPD Officers Arrest DONNER After He Leads Them on a High-Speed Chase**

11.  According to LAPD reports, on December 30, 2022, at approximately 7:40 a.m., LAPD Officers Hernandez and Magana

responded to a radio call for a "Male Under the Influence in a Vehicle". The reporting party, a concerned citizen, called LAPD at approximately 7:20 a.m., to report that an unknown individual, later identified as DONNER, was asleep, possibly under the influence of unknown substances, behind the wheel of the Charger on Independence Avenue near Saticoy Street in Canoga Park, California. The reporting party honked at DONNER, who woke up. When LAPD Officers located the Charger, it was parked along the curb facing northbound, in the wrong direction, on Fairchild Avenue north of Baltar Street.

12. As LAPD officers approached the Charger, they saw DONNER asleep in the front driver seat of the vehicle. DONNER was startled awake by the officers, who asked him to step out of the vehicle. Instead of complying, DONNER fumbled with the gear shift, started the Charger, and drove away. LAPD Officers then initiated a pursuit of the Charger, believing that DONNER was driving under the influence of an unknown substance.

13. According to their reports, as LAPD officers pursued the Charger, they saw DONNER commit multiple traffic infractions, including: failure to stop at sign limit line, in violation of Vehicle Code section 22450(a); driving on the wrong side of the road, in violation of Vehicle Code section 21651(b); failure to stop at a red light, in violation of Vehicle Code section 21453(a); and unsafe speed, in violation of Vehicle Code section 22350. DONNER drove through several red lights and made a left hand turn heading eastbound onto Oxnard St. As LAPD

officers continued on Oxnard St., they lost sight of the Charger and terminated the pursuit.

14.  LAPD Officers Lombardo and Checa canvassed the area where the Charger was last seen and located it in front of 20617 Tiara St.  The officers saw a suspect, described as a white male wearing a black jacket and blue jeans (and later identified as DONNER) heading north on Kelvin Ave. towards Oxnard St.  After they broadcast the suspect's description over the radio, LAPD officers located DONNER in a nearby alley, who was seen stumbling and unsteady, in front of 20450 Oxnard St, where he was taken into custody.  DONNER identified himself as his brother, S.D., but officers were able to identify his true identity utilizing law enforcement databases that contained booking photos and fingerprint analysis.

15.  LAPD Officers Magana and Hernandez, the original responding officers, arrived at the scene and positively identified DONNER as the individual seen driving the Charger. DONNER was arrested for Felony Evading Reckless Driving, in violation of Vehicle Code section 2800.2(a).  In a search incident to arrest, LAPD officers located the key fob to the Charger in DONNER'S right front pocket.

### B.  A Local Resident Alerts LAPD that DONNER Hid an Item, Later Identified as a Firearm, in a Trash Can

16.  According to their reports, while officers were arresting DONNER, LAPD received another call from a citizen stating that an unknown subject was seen hiding in a dumpster near Kelvin Avenue, which was the area near where DONNER was

apprehended.  LAPD Officers Tortola and Han responded to the call.  While conducting a foot patrol around the area, the officers discovered four IDs and three debit/credit cards, and four gift cards on the ground outside of the trash can.  One of the IDs, believed to be counterfeit, was an Arizona ID bearing DONNER's photograph and the name "S.D."

      17.  As LAPD officers continued to search the area around the trash can, a resident notified LAPD officers that his home surveillance footage showed an unknown individual, later identified as DONNER, getting out of the Charger, putting an unknown item into the resident's trash can, and then walking away.  LAPD officers looked inside the trash can and found a black Smith and Wesson, Model M&P 40 Shield, .40 caliber semi-automatic pistol, bearing serial number JEZ0751, on top of a white trash bag.  The pistol was loaded with four rounds of ammunition in the magazine and one round located in the chamber.

      **C.  LAPD Officers Find Evidence of Identity Theft, Mail Theft, and Firearms and Drug Offenses During a Search of the Charger**

      18.  After DONNER's arrest, LAPD officers searched the Charger and found the following evidence:

      a.  An empty FedEx package addressed to DONNER and mail matter addressed to names other than DONNER found inside the Charger.

      b.  SUBJECT DEVICES 1 and 2; a key ring with a U-Haul key and car key; and a clear syringe containing a liquid brown substance resembling heroin on the driver's side floorboard.

    c. A parcel box on the front passenger's floorboard, containing a glass pipe containing: a white substance resembling methamphetamine; a metal spoon containing a tar-like substance resembling heroin; a clear used syringe containing liquid brown substance resembling heroin; a CVS medicine bottle of toothache medication; and a clear plastic bag containing two driver's licenses in names other than DONNER, 21 credit/debit cards in names other than DONNER, one gift card and one hotel card.

    d. A pink and yellow bag containing a glass pipe with white substance resembling methamphetamine; SUBJECT DEVICE 3.

    e. Two credit/debit cards in names other than DONNER; mail addressed to DONNER; SUBJECT DEVICES 4 and 5; and miscellaneous documents containing PII in names other than DONNER in a black case.

    f. A Ralph's gift card; and a credit/debit card in a name other than DONNER's in the driver's door armrest;

    g. SUBJECT DEVICES 6 and 7 found between the driver's seat and the center console;

    h. SUBJECT DEVICE 8 found between the center console and the front passenger seat;

    i. A key ring with three keys and key fob; a key ring containing three counterfeit United States Postal Service ("USPS") "Arrow Keys"[1]; a key ring with black remote, key fob and

---

[1] An "arrow key" is a specialized key that USPS employees carry and which is used to access USPS mail receptacles such as the following: USPS collection boxes, apartment buildings (to

*(footnote cont'd on next page)*

eight keys; and a key ring with seven keys and pendant in a gray backpack on the front passenger's floorboard.

j.  A magazine for 5.56x 45 caliber ammunition, containing thirteen rounds of 5.56x 45 live ammunition; and additional rounds of 5.56x 45 live ammunition in the trunk.

### D.  Inspection and Testing of the Counterfeit Arrow Keys

19.  I inspected the three arrow keys and key template recovered from the Charger and identified them as counterfeit postal arrow keys.  Based on my training and experience, I know that arrow keys are distinctively shaped keys used by USPS employees to open mail receptacles such as panels of apartment mailboxes.  Arrow keys are counterfeited by mail thieves in order to gain access to apartment building mail receptacles and to steal mail.

20.  On January 25, 2023, I tested the counterfeit arrow keys that were recovered during the arrest of DONNER on approximately 60 genuine postal arrow locks.  One of the arrow keys was able to open a genuine postal lock for zip code 91364, Woodland Hills, CA.  The key is silver in color with a silver scissor handle has the phrase "WN2" written in black ink along the top of the key.

---

access interior mail boxes, and neighborhood delivery collection box units, among others.  These keys are often times the target of criminals who know of their existence and know how they can be used.

## V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

21. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

    a. People who steal mail are often found in possession of counterfeit Postal Arrow Keys. Mail thieves will often trace the outline of a postal arrow key in order to make additional copies.

    b. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

    c. It is a common practice for those involved in mail theft, identity theft, and access device fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction. Those who engage in such fraud keep evidence of such retail transactions in their homes and cars.

    d. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.

Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

   e. Mail and identity thieves often take pictures of items retrieved from stolen mail or mail matter with their cellphones.

   f. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

   g. Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank

fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

22.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

     a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

     b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

        a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

        c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. As used herein, the term "digital device" includes the SUBJECT DEVICES.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

       a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

       b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

       a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

  28. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Jason Christopher DONNER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Jason Christopher DONNER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature

  29. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### IX. CONCLUSION

  30. For all the reasons described above, there is probable cause to believe that DONNER committed a violation of 18 U.S.C. § 1704 (Unlawful Possession of Postal Keys).  There is also probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

of the Subject Offenses will be found in the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __30__ day of January, 2023.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE